NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5327-18T1

JOHN C. SULLIVAN, as
Trustee of the Sylvester L.
Sullivan Grantor Retained
Income Trust, and
SYLVESTER L. SULLIVAN
GRANTOR RETAINED
INCOME TRUST,

> **APPROVED FOR PUBLICATION**
> **November 13, 2020**
> **APPELLATE DIVISION**

      Plaintiffs-Respondents/
Cross-Appellants,

v.

MAX SPANN REAL ESTATE
& AUCTION CO.,

      Defendant-Respondent,

and

MENGXI LIU,

      Defendant-Appellant/
Cross-Respondent.

_____

          Argued October 1, 2020 – Decided November 13, 2020

          Before Judges Fuentes, Whipple and Firko (Judge
Fuentes dissenting).

          On appeal from the Superior Court of New Jersey,
Law Division, Somerset County, Docket No. L-1036-
17.

Randall J. Peach argued the cause for appellant/cross-respondent (Woolson Anderson Peach, PC, attorneys; Randall J. Peach, of counsel and on the brief).

Pierre Chwang argued the cause for respondents/cross-appellant (Wilentz, Goldman & Spitzer, PA, attorneys; Pierre Chwang, of counsel and on the briefs).

Kevin P. Benbrook argued the cause for respondent (Benbrook & Benbrook, LLC, attorneys; Kevin P. Benbrook, on the brief).

Barry S. Goodman argued the cause for amicus curiae New Jersey Realtors® (Greenbaum, Rowe, Smith & Davis LLP, attorneys; Barry S. Goodman, of counsel and on the brief; Conor J. Hennessey, on the brief).

F. Bradford Batcha argued the cause for amicus curiae New Jersey State Bar Association attorneys; (Evelyn Padin, of counsel and on the brief; F. Bradford Batcha, Alexander Fineberg, Martin Liberman and Lee B. Roth, on the brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

Defendant Mengxi Liu (Liu) appeals from a July 22, 2019, order entering judgment finding that real estate auction sales contracts prepared by attorneys, licensed real estate brokers or salespersons, need not contain the three-day attorney review clause mandated by N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Boards, 93 N.J. 470 (1983), and codified in N.J.A.C. 11:5-6.2(g), when a blank, pre-printed contract is sent to a bidder prior to the

auction of a single family home and recommends an attorney review the contract. Liu, the highest bidder at an auction, seeks return of her $121,000 deposit monies after not being able to secure financing. Plaintiff John C. Sullivan, as trustee of the Sylvester L. Sullivan Grantor Retained Income Trust and Sylvester L. Sullivan Grantor Retained Income Trust (Sullivan) and (GRIT), cross-appeal seeking affirmance of the inapplicability of the three-day attorney review period to this residential auction sale and reversal of the trial court's decision to divide the deposit between Sullivan, GRIT, and defendant Max Spann Real Estate & Auction Co. (Max Spann). For the reasons that follow, we affirm.

## I.

Many of the pertinent facts are undisputed. The Sullivan GRIT owned the subject property, a single-family residence consisting of five-plus acres, located at 280 Mendham Road in Bernardsville. In spring of 2016, Sullivan decided to auction the home and engaged Max Spann, a licensed real estate brokerage agency, to conduct the auction. The agency is operated by Max Spann, Jr., a licensed real estate broker. Max Spann prepared an auction agreement (Auction Agreement), which required it to:

> conduct a public auction . . . and shall coordinate marketing efforts in connection with such public auction. Broker is responsible for layout and design of brochure, flyers, newspapers, advertising, and news

3

releases, site selection, qualifying buyers, working with third party real estate agents, and all other work necessary for a successful auction.

Max Spann's commission, payable by the buyer, would equal 10% of the final bid. The section of the Auction Agreement entitled, "Performance by Purchaser," provided:

> Broker agrees to use its best efforts to obtain the highest available bid for the Property(s) at the Auction, and to endeavor to have the high bidder submit a written offer in the form of Contract of Sale created and approved by seller's attorney conforming to the highest bid. It is expressly agreed and understood, however that Broker does not guarantee the bid results or performance by the highest bidder, and therefore, shall not be responsible if, for any reason, the high bidder shall refuse to submit a written offer conforming to the bidding at the Auction <u>nor shall Broker be responsible if the highest bidder should fail to perform under his Contract of Sale</u>, or to comply with escrow instructions that may thereafter be executed. <u>In any such event, no commission shall be earned or paid to Broker.</u>

> [(Emphasis added).]

Paragraph 6B continues:

> Broker shall collect earnest money deposit from the high bidder which will be held in Broker's escrow account until closing of title. <u>In the case of forfeiture by a prospective Purchaser</u> of any earnest money payment upon the above described properties, <u>said earnest money shall be divided equally between the parties hereto</u>, one-half to the seller and one-half to the broker, <u>except the broker's portion shall not exceed the regular commission due.</u>

A-5327-18T1

[(Emphasis added).]

The Auction Agreement then states: "[T]his agreement may not be modified in any respect unless in writing signed by all parties hereto. TERMS OF SALE ARE CASH, CLOSING WITHIN [THIRTY] TO [FORTY-FIVE] DAYS OF AUCTION SALE DATE." On September 1, 2016, Sullivan and Max Spann signed the Auction Agreement.

Liu and her husband, Liang Wang (Wang), are seasoned real estate investors, having acquired their own home in addition to five other rental properties. A college graduate, Liu's native language is Mandarin Chinese, and she claims to have only basic conversational English skills. Liu and Wang function as a team, with Liu handling the finances and Wang, who is proficient in English, reading and reviewing documents. In the past, Liu and Wang attended four or five Max Spann auctions and bid at one of them.

After attending at least two open houses, including one held on September 25, 2016, Liu indicated that she liked the Bernardsville property. After the open house, Liu believed the property was worth between $700,000 and $800,000. At the September 25, 2016, open house, Liu and Wang completed a bidder registration form that was previously prepared by Max Spann.

The bidder registration form contained several acknowledgements:

1. I hereby agree to sign the contract of sale immediately upon the conclusion of bidding. <u>A 10% deposit of the contract price is required.</u> All bidders must be pre-registered and are required to have bank cashier's check in the amount of <u>$40,000</u> made payable to yourself and endorsed to escrow bidder after completion of auction. A second check, personal check, is required for the balance of a ten percent deposit. <u>NO EXCEPTIONS, PLEASE.</u>

2. <u>I recognize that this is an auction sale and is not subject to an attorney review period.</u> I will review the contract of sale prepared by Seller's Counsel prior to the auction.

3. I have read the terms of this sale posted on the premises printed on the sale brochures and said terms are incorporated herein by reference as are any public announcements made sale day.

4. I agree to review the property information package prior to attending auction.

[(Emphasis added)].

The bidder registration form also set forth information about the ten-percent buyer's premium, the as-is terms of the sale, and the auction date—October 20, 2016. On September 25, 2016, Wang signed the bidder registration form and submitted it to Max Spann.

Thereafter, a property information package was sent to Liu and Wang, which included a blank template of the Sales Contract contemplated by the Auction Agreement. The Sales Contract was developed by Max Spann and its attorneys over the course of several years. Counsel for Sullivan reviewed and

6

approved the Sales Contract without any requested changes. The blanks in the Sales Contract were to be filled in with the buyer's contact information, the bid price, the buyer's premium, and the total purchase price.

The Sales Contract provided that "[a]ll deposit monies will be held in escrow by [Max Spann] . . . until closing. Paragraph fifteen entitled, "PARTIES LIABLE; liquidated damages," reads:

> The contract is binding upon all parties who sign it…. <u>Purchaser represents that he/she has sufficient cash available to consummate the within transaction.</u> Unless the conditions of this Contract shall in all respects be complied with by purchaser in the manner provided in the Contract, Purchaser shall lose all rights, remedies, or actions either at law or equity under this Contract. <u>Purchaser shall lose the deposit as liquidated damages, such damages being difficult, if not impossible to ascertain, and Seller shall be released from all obligations to convey said property and retains the right to seek further damages due to Purchaser's default.</u> This contract shall become null and void and neither party shall have further rights against the other.
>
> [(Emphasis added).]

Paragraph twenty-two, entitled "ATTORNEY REVIEW," explains:

> This contract was reviewed and prepared by Seller's counsel. While the terms and conditions herein are non-negotiable and will not be altered, it has been made available for review by prospective purchasers and their legal representation prior to Auction Day and on Auction Day itself. <u>Both parties agree that the three-day attorney review period does not apply to this transaction.</u> If this contract relates to a new

7

construction sale, the attached cancellation addendum shall apply pursuant to New Jersey State Law.

[(Emphasis added).]

The Sales Contract also contains a "Notice to Buyer and Seller," which cautions, "Read This Notice Before Signing The Contract."  This notice reads:

1. As a real estate broker, I represent the seller, not the buyer.  The title company does not represent either the seller or the buyer.

2. You will not get any legal advice unless you have your own lawyer. Neither I nor anyone from the title company can give legal advice to either the buyer or the seller. If you do not hire a lawyer, no one will represent you in legal matters now or at the closing. Neither I nor the title company will represent you in these matters.

3. The contract is the most important part of the transaction. It determines your rights, risks, and obligations. Signing the contract is a big step. A lawyer would review the contract, help you to understand and negotiate its terms.

4. The contract is final and binding, and you cannot change or cancel the contract unless the seller agrees. Neither can the real estate broker nor the title company change the contract.

[(Emphasis added).]

The template of the Sales Contract provided to Liu and Wang in the property information packet mirrored the copy eventually signed on the auction day nearly one month later.  There was no mortgage contingency

provision in the Sales Contract—the purchase was an "all cash" deal. The Sales Contract further provided that Liu represented she "has sufficient cash available to consummate the within transaction." On October 20, 2016, Max Spann conducted an auction of the property. Upwards of forty people attended, including Liu and Wang. Liu was the successful bidder at the auction with a high bid of $1,100,000.

Immediately after the auction concluded, Liu, Wang, and Sullivan were escorted to a table staffed by at least one realtor employed by Max Spann. The blanks on the Sales Contract were filled in, and a Max Spann employee and licensed realtor, Susan Dann, witnessed the signatures. The trial court found that it was "most probably Susan Dann" who filled in the blanks in the Sales Contract. According to Sullivan, Liu signed the Sales Contract knowing she could only obtain a mortgage loan not exceeding $800,000.

Upon signing the Sales Contract, Liu wrote a personal check for $81,000, which combined with the $40,000 cashier's check for a total of $121,000, represented the ten percent earnest money deposit required by the Sales Contract. The closing date was scheduled for December 5, 2016.

In order to procure the requisite funds, Liu attempted to secure two mortgages on her rental properties and obtain financing in China but was unsuccessful. On December 14, 2016, Sullivan's attorney sent Liu a time-is-

of-the-essence demand letter scheduling a new closing date of December 28, 2016. Since Liu could not secure financing, she was unable to close title. Max Spann retained the $121,000 escrow deposit, forfeited under the terms of paragraph fifteen of the Sales Contract, which remained in Max Spann's escrow account. Sullivan engaged Max Spann again, and a second auction was held on March 9, 2017. The winning bid was $825,000. The closing proceeded and Max Spann earned an $82,500 commission.

On August 28, 2017, the GRIT and Sullivan filed a complaint in the Law Division against Max Spann alleging breach of contract and breach of the covenant of good faith and fair dealing by retaining the escrow funds based on Liu's inability to consummate the purchase of plaintiffs' property. The trial court ordered Sullivan and GRIT to amend their complaint to add Liu as an indispensable party. On December 7, 2017, plaintiffs filed an amended complaint naming Liu as a defendant. In addition, plaintiff sought a declaratory judgment against Liu alleging breach of contract and that she forfeited her right to the escrow deposit. Plaintiffs sought return of Liu's $121,000 deposit monies to the GRIT as liquidated damages. Liu claimed the Sales Contract was void ab initio as against public policy for failing to include a three-day attorney review provision as outlined in N.J. State Bar Ass'n and N.J.A.C. 11:5-6.2(g).

On January 11, 2018, Max Spann filed an answer and a counterclaim against plaintiffs and a cross-claim against Liu. Plaintiffs and Liu filed answers to the counterclaim and cross-claim. A prior judge denied cross-motions for summary judgment and determined there were triable issues of fact and law as to whether the Sales Contract was void because it did not include a three-day attorney review provision.

On April 10, 2019, a one-day bench trial took place before the trial court. After considering the testimony and evidence, the trial court rendered an oral opinion on June 26, 2019. Relying upon our decision in Golfinopoulos v. Padula, 218 N.J. Super. 38, 47 (App. Div. 1987), and Black's Law Dictionary, the trial court concluded: "An auction sale is different from normal real estate transactions, and the difference is that an auction without reserve is a unique methodology in which the owner essentially becomes an offer[o]r and a successfully higher bid creates a contingent contract, the highest bid creating an enforceable agreement." Black's Law Dictionary (148th ed. 2004).

The trial court found the Contract of Sale was broker-prepared and that:

> real estate sales contracts prepared by licensed real-estate brokers or salespeople need not contain the three-day attorney review clause mandated by [N.J. State Bar Ass'n][1] where a blank, pre-printed contract

---

[1] N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Boards, 93 N.J. 470 (1983).

is sent to a bidder with enough time before the auction to seek attorney review, and recommends in a notice to have the blank, pre-printed contract reviewed by an attorney.

Further, the trial court found Liu breached the Sales Contract by failing to close the transaction and that plaintiffs failed to prove a breach of contract by Max Spann in failing to properly qualify bidders, "particularly in light of the exculpation clause in the Auction Agreement." The trial court did not excuse Liu from her obligations under the Sales Contract because she failed to establish "her limited use of the English language and the fact that [Wang] signed her name to various paperwork."

The trial court ordered Liu's $121,000 deposit be equally divided between Sullivan as trustee of the GRIT ($60,500 plus interest)[2] and Max Spann ($60,500 plus interest). After rendering its oral decision, the trial court entered an order dismissing the matter on June 26, 2019, and requested that plaintiffs' counsel submit a proposed form of judgment under Rule 4:42-1(c), the five-day rule. Liu objected to plaintiffs' proposed form of order and submitted an alternate form of judgment, which the court executed on August 23, 2019. The trial court also granted Liu's request for a stay pending appeal.

---

[2] Interest was calculated on the deposit monies pursuant to Rule 4:42-11.

On appeal, Liu contends the trial court erred: (1) by not voiding the Sales Contract because it was prepared by a licensed real estate salesperson and failed to include the three-day attorney review provision required by N.J. State Bar Ass'n; (2) by creating a new "auction exception" without Supreme Court approval; (3) by applying its new rule to Liu retroactively and forfeiting her $121,000 deposit; (4) by not awarding Liu counsel fees; and (5) in not declaring the Sales Contract impossible to perform.

In their cross-appeal, Sullivan and GRIT contend the trial court erred by dividing the $121,000 deposit monies between them and Max Spann in the face of an ambiguous contractual term, which should have been interpreted in favor of the non-drafting party. Sullivan and GRIT assert auction contracts do not fall under the ambit of N.J. State Bar Ass'n and the liquidated damages claim is not unconscionable in light of the extensive damages incurred by plaintiffs. Max Spann seeks affirmance.

In its amicus brief, New Jersey Realtors® argues the court's decision in Bassford v. Trico Mortgage Co., Inc., 223 N.J. Super. 379 (Law Div. 1993), supports confirmation from this court that an auction real estate Sales Contract does not require a three-day attorney review provision, and there is no rational basis to draw a distinction based upon whether the person who fills in the blanks in a real estate auction contract acts as a real estate licensee. The New

13

Jersey State Bar Association (NJSBA) argues the contrary in its amicus brief and urges any realtor-prepared residential real estate contract that fails to contain the attorney review language set forth in N.J.A.C. 11:5-6.2(g), even if prepared for a private real estate auction sale, is unenforceable because only our Court can mandate such a change.

## II.

We note that factual determinations "made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review[.]" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (citing In re Trust Created by Agreement Dated Dec. 20, 1961, ex. rel. Johnson, 194 N.J. 276, 284 (2008)). We will not "'disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Ibid. (quoting In re Trust, 194 N.J. at 284) (internal quotation omitted).

The trial court's decisions on issues of law are, however, subject to plenary review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "[W]e owe no deference to a trial court's interpretation of the law, and review issues of law de novo." Cumberland Farms, Inc. v. N.J. Dep't of Envt'l Prot., 447 N.J. Super. 423, 438 (App. Div. 2016). Contract

construction and interpretation is a matter of law and thus subject to de novo review. Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998). "[T]he legal consequences that flow from established facts are not entitled to any special deference." Manalapan, 140 N.J. at 378.

Liu argues that the trial court erred in holding auction derived real estate Sales Contracts do not require a three-day attorney review clause. Specifically, Liu contends the absence of the review clause renders the Sales Contract here unenforceable, entitling her to a return of her $121,000 deposit. Further, Liu asserts the trial court erred by applying the attorney review exclusion to her retroactively.

Our Court first mandated the three-day attorney-review period in N.J. State Bar Ass'n, 93 N.J. at 472. There, the NJSBA initially sought to enjoin the New Jersey Association of Realtor Boards, now known as New Jersey Realtors®, from preparing any real estate contracts, arguing that doing so constituted the unauthorized practice of law. Id. at 472. The two sides eventually entered a consent agreement, which the Court subsequently reviewed "under [its] constitutional powers governing the practice of law." Id. at 472-73 (citing N.J. Const. art. VI, § II, ¶ 3). Since resolution "would necessarily implicate" whether certain conduct would constitute "the unauthorized practice of law, Court approval [was] required." Id. at 473.

15

Protection of the public interest served as the guiding force behind the attorney-review provision. Id. at 474; see also Conley v. Guerrero, 228 N.J. 339, 352 (2017) (noting that N.J. State Bar Ass'n was "concerned first and foremost with protecting consumers' rights"); Calvert v. K. Hovnanian at Galloway, Vi, 128 N.J. 37, 45 (1992) ("[W]hat N.J. State Bar Ass'n sought to protect was not the private interest of lawyers but rather the public's right to be protected from inadequate information."). The Court ultimately reviewed, modified, and approved the attorney review requirement in part because it can "reasonably accommodate[] and safeguard[]" the public interest. N.J. State Bar Ass'n, 93 N.J. at 474.

Pursuant to N.J. State Bar Ass'n, licensed realtors may prepare real estate Sales Contracts, provided the contract meets certain criteria and contains specific language. First, the property must either consist of no more than four residential units or a vacant one-family lot. Id. at 475. In such a case, a licensed realtor may prepare the contract, with the following wording on the first page:

> THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT.
> . . . .

The Buyer or the Seller may choose to have an attorney study this contract. If an attorney is consulted, the attorney must complete his or her review of the contract within a three-day period. This contract will be legally binding at the end of this three-day period unless an attorney for the Buyer or the Seller reviews and disapproves of the contract.

[N.J. State Bar Ass'n, 93 N.J. at 475-76.][3]

Additionally, licensed realtors "are . . . permanently enjoined and restrained from drafting, filling in blanks or preparing contracts for the sale of residential real estate" because "[t]he drafting or preparation of any Sales Contracts for [such] residential real estate . . . except as provided herein shall constitute the unauthorized practice of law." Id. at 481. Realtors also cannot prepare any document that would "waive, disclaim, relinquish or abridge" a parties' right to obtain attorney review. Ibid. "Whether a [realtor] completes a real-estate contract by filling in the blanks of a form contract, or writes the entire contract, he or she is within the ambit of N.J. State Bar Ass'n." Calvert, 128 N.J. at 46. The provision grants buyers' and sellers' attorneys a three-day period in which to review or cancel a residential Sales Contract if either so desires. N.J. State Bar Ass'n, 93 N.J. at 481.

---

[3] See also N.J.A.C. 11:5-6.2(g) mandating inclusion of N.J. State Bar Ass'n language and subjecting realtors to sanctions for omitting same from realtor prepared contracts.

The aim of the Legislature in adopting N.J.A.C. 11:5-6.2(g) was to protect members of the public, sellers and buyers, in a typical real estate transaction involving one-to-four family homes. The unique circumstances of a private real property auction do not fall under the ambit of N.J.A.C. 11:5-6.2(g). The seller has an interest to sell property in an expedient manner and liquidate their interest. Potential buyers are encouraged to seek counsel before the auction is held and review their financial wherewithal. "Consumers are given notice to expect their bids will be binding at auction. They voluntarily attend and bid at an auction for real property." Bassford, 273 N.J. Super. 379 at 386.

We emphasized the impact the three-day attorney review requirement would have on real property auctions:

> The sellers at an auction would be unduly burdened by the impact of an attorney review clause. Such a requirement would allow buyers the opportunity to seek out another purchaser at a cost greater than the bid made by the buyer at auction. If the buyer was unsuccessful he or she could attempt to evoke the attorney review clause simply because another purchaser could not be found in seventy-two hours. An attorney review clause would allow this action since an attorney may cancel for any reason within seventy-two hours of signing the contract. Judicial sales and foreclosure sales do not allow the possibility of such abuse. Arguably, no attorney review is allowed of such bids, to protect the expediency and finality of the bidding process.

[Id. at 387.]

Max Spann argues that our Court's decision in Panetta v. Equity One, Inc., 190 N.J. 307 (2007), an auction case, militates against inclusion of an attorney-review provision in an auction context. We agree. Panetta involved a riparian grant and whether a party's confusion in a closed auction setting required rebidding. 190 N.J. at 312-14. In dicta, Panetta defines auctions as a "unique methodology" where bidding contracts are created upon the auction's conclusion, with "the highest bid creating an enforceable agreement." Id. at 324-25.

Liu, a prospective bidder, had "notice of the binding nature of the sale and encouragement to seek counsel prior to" the auction. We discern no incongruity between the goals advanced in N.J. State Bar Ass'n vis-à-vis the Sales Contract at issue, which we hold validly waived the three-day attorney review. We hold that a private real estate auction sale is not the consumer type contract contemplated in N.J. State Bar Ass'n, and therefore, the three-day attorney review period is not required in such a sale.

Here, the auction was without reserve and was final when the hammer came down. We find nothing repugnant about the auction process as conducted in the matter under review and it was not in contravention of the public policy goals of N.J.A.C. 11:5-6.2(g), which addresses traditional,

19

residential real estate contracts.  To hold otherwise would vitiate over thirty years of established real estate auction practice in this State and render the real estate auction process futile.  That was not the Court's pronouncement in N.J. State Bar Ass'n nor the Legislature's intention in enacting N.J.A.C. 11:5-6.2(g).  Moreover, Liu had a duty to read the Sales Contract before signing it, or having her husband sign it on her behalf, and is therefore bound by it.  See 49 Elga A. Goodman, Kristina J. Pappa & Brent A. Olson, N.J. Practice Series: Business Law Deskbook § 7:16, p. 288 (2011) ("one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that the party did not read or understand them").

We note contracts that require but lack the attorney review provision can be voidable.  See Freedman v. Clonmel Const. Corp., 246 N.J. Super. 397, 403 (App. Div. 1991) (holding that voiding a contract that omits the required attorney review provision "is . . . the only conclusion consistent with the public policy underlying . . . [N.J. State Bar Ass'n]").  Omitting required provisions is a "deficiency [that] persists even though language in [other] documents apart from the contract suggest[s] that [a buyer] seek legal counsel." Calvert, 128 N.J. at 49.  However, in N.J. State Bar Ass'n, the Court made no mention of auction sales at all.  Requiring the three-day attorney review in a private real estate auction setting would undermine the auction

20

process and render it useless. And, we are unpersuaded that the trial court found the blanks on the Sales Contract under review were likely filled in by a Max Spann employee.

The Court again exercised its constitutional power to address "another long-simmering dispute between realtors and attorneys." In re Opinion 26, 139 N.J. 323, 325 (1995). There, the Court confronted the risks of the unauthorized practice of law and a South Jersey custom where title agencies and realtors handle all aspects of real estate transactions. Id. at 326. The Court approved modified language to accompany and precede all broker-prepared real estate contracts to permit the South Jersey practice while still warning the public about the risks of not retaining an attorney. Again, In re Opinion 26 did not address auction sales and is inapposite for purposes of the matter under review.

We restate the core principles of statutory construction that must guide our analysis. "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). A court should "ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid.; see also Soto v. Scaringelli, 189 N.J. 558, 569

(2007). Ultimately, a court's role when analyzing a statute is to give effect to the Legislature's intent as evidenced by the "language of [the] statute, the policy behind it, concepts of reasonableness and legislative history." Johnson Mach. Co. v. Manville Sales Corp., 248 N.J. Super. 285, 304 (App. Div. 1991) (citing Cedar Cove v. Stanzione, 233 N.J. Super. 336, 340 (App. Div. 1989); Shapiro v. Essex Cty. Bd. of Chosen Freeholders, 177 N.J. Super. 87, 92-93 (Law Div. 1980)). We reiterate that we conclude our Court and Legislature did not intend for the three-day attorney review period to apply to private real estate auction sales, and the trial court's finding of a breach of contract by Liu was adequately supported by the record. We find no basis for deviating from that finding.

### III.

Liu next contends that the liquidated damages provision in the Sales Contract amounts to an unenforceable penalty. Sullivan responds that the clause is not unconscionable in light of the extent of damages it suffered. Regarding the evaluation of liquidated damages clauses, our Court has adopted the methodology described in the Restatement (Second) of Contracts (Am. Law Inst. 1981) § 356, which provides that:

> [d]amages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proof of

loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

[MetLife Capital Fin. Corp. v. Wash. Ave. Assocs.,
159 N.J. 484, 494 (1999).]

The Court has held that "the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties all affect the validity of a stipulated damages clause," and that the "overall single test of validity" is whether the liquidated damages clause is "reasonable under the totality of the circumstances." Id. at 495 (citations and internal quotation marks omitted). In a commercial contract between sophisticated parties, liquidated damages clauses are presumptively reasonable, and the party challenging the clause bears the burden of proving its unreasonableness. Id. at 496.

Normally, invalidation of a liquidated damages clause occurs only when a court determines that the liquidated damages are so high so as to constitute a penalty. Here, the Sales Contract provided, "[p]urchaser shall lose the deposit as liquidated damages, such damages being difficult, if not impossible to ascertain, and Seller shall be released from all obligations to convey said property . . . ." (emphasis added). Moreover, the actual damages sustained by Sullivan—the difference between Liu's bid and the amount at which the property eventually sold at the second auction—was $275,000. The trial court

23

correctly determined that the liquidated damages provision in the Sales Contract was enforceable, and we conclude the liquidated damages clause is not invalid as a matter of law or public policy, either on its face or as applied.

Equally unavailing is Liu's contention that even if the Sales Contract is enforceable, her performance should be excused because of her inability to obtain financing rendering the contract impossible to perform. "Impossibility or impracticability of performance are complete defenses where a fact essential to performance is assumed by the parties but does not exist at the time for performance." Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div. 1992). "[P]erformance . . . is rendered impracticable by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 171 N.J. 378, 391 (2002). "[I]f performance has unexpectedly become impracticable as a result of a supervening event," a court may relieve performance even when the contract did not expressly provide. Facto v. Pantagis, 390 N.J. Super. 227, 231 (App. Div. 2007) (citing Restatement (Second) of Contracts § 261 cmt. a (Am. Law Inst. 1981)).

Importantly, the defense does not include instances "where the difficulty is the personal inability of the promisor to perform." Connell, 255 N.J. Super. at 49. "[A] party cannot render contract performance legally impossible by its

own actions." Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 303 (App. Div. 2013) (citing Creek Ranch, Inc. v. N.J. Turnpike Auth., 75 N.J. 421, 432 (1978)).

In Connell, we addressed facts similar to those at issue here. A buyer entered into a contract to purchase a home. Connell, 255 N.J. Super. at 48. The contract contained a waivable mortgage contingency, and a clause where the buyer represented "he ha[d] sufficient cash available," inclusive of contemplated mortgages, "to complete [the] purchase." Id. at 49. After the buyer waived the mortgage contingency, his financing fell through. We held that "the buyer took upon himself the risk of the failure of his financial plans . . . [and] misrepresented his financial condition to the seller—no doubt in the good faith belief that everything was going to work out." Id. at 50 (emphasis added).

Here, the Sales Contract did not contain a mortgage contingency clause; rather, it was clear that the purchase would be an "all cash" deal. And, the Sales Contract further provided, and Liu represented, that she "has sufficient cash available to consummate the within transaction." As in Connell, it seems Liu hoped "everything was going to work out," but that does not constitute impossibility of contract performance. Accordingly, the trial court properly dismissed Liu's impossibility and impracticability defenses.

## IV.

Finally, in the cross-appeal, Sullivan contends the trial court erred by dividing the forfeited earnest deposit money equally between Sullivan and Max Spann. Sullivan claims that the provision calling for the equal split of the forfeited deposit is ambiguous and should be construed against Max Spann as the drafting party.

Paragraph 6(A) of the Auction Agreement states that "if, for any reason, the high bidder . . . should fail to perform under his Contract of Sale . . . no such commission shall be earned or paid to Broker." Paragraph 6(B) continues: "[I]n case of forfeiture by a prospective purchaser of any earnest money . . . said earnest money shall be divided equally between the parties hereto, one-half to the Seller and one half to the Broker, except the Broker's portion shall not exceed the regular commission due."

The record shows Sullivan participated in negotiating the Auction Agreement with Max Spann. At trial, Sullivan testified he was familiar with the terms of the contract, and that his father had an attorney review it before signing. Sullivan argues Liu's breach of contract did not entitle Max Spann to any commission, while Max Spann aptly points out that the equal split "is far less than the . . . commission that it would have earned, had Liu not defaulted . . . ." (emphasis added).

"Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Dev., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). Whether a contract term is clear or ambiguous amounts to a question of law. Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997). A contract is ambiguous if it is reasonably susceptible to two interpretations. Potomac Ins. Co. of Illinois ex rel. OneBeacon Ins. Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 425 N.J. Super. 305, 324 (App. Div. 2012). Contract terms must be given their plain and ordinary meaning. Nester, 301 N.J. Super at 210. Courts should not "torture the language of a contract to create ambiguity." Stiefel v. Bayly, Martin & Fay, Inc., 242 N.J. Super. 643, 651 (App. Div. 1990).

The trial court found Max Spann's reading of paragraphs 6A and 6B to be a fair interpretation because "[i]f you did not divide the earnest money equally, you'd be interpreting the contract in such a way that provision 6B is meaningless, and [c]ourts are want to do that." Sufficient credible evidence exists demonstrating that Sullivan and Max Spann agreed on how to divide any earnest deposit money in the event of a breach or default, and the trial court did not err in dividing the deposit monies equally between them.

27                                                              A-5327-18T1

We have also considered the additional issues raised by the parties and amicus and conclude they are without merit and require no further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5327-18T1

_____

**FUENTES, P.J.A.D., dissenting.**

The New Jersey Constitution endows the Supreme Court with the exclusive jurisdiction over the practice of law. N.J. Const. art. VI, § 2, ¶ 3. The Court sets the standard for admission to practice law in this State, regulates attorney conduct, promulgates ethical guidelines for the practice of law, adjudicates attorney disciplinary infractions, sanctions attorneys who violate their professional and ethical responsibilities, and, of particular relevance here, delineates which activities, in and of themselves, constitute the practice of law. Stated differently, the Supreme Court's constitutional role and authority over the practice of law is sui generis.

The Court exercised this constitutional authority in New Jersey State Bar Ass'n v. New Jersey Ass'n of Realtor Bds., 93 N.J. 470, modified, 94 N.J. 449 (1983), when it approved the settlement reached by the Association of Realtors and the State Bar Association that addressed actions by licensed realtors that constitute the practice of law. However, the Court made clear that "the settlement implicates and addresses concerns that go beyond the direct and immediate interests of the primary professional associations . . . ." Id. at 474. The settlement agreement the Court approved in N.J. State Bar Ass'n was intended to protect the public interest by mandating the inclusion of specific

language in every contract prepared by licensed realtors involving the sale of one to four-family dwellings and vacant one-family lots in transactions in which they have a commission or fee interest.

In addition to providing the explicit language required in all realtor-prepared contracts, the Court delineated the role lower courts would have in the enforcement of this mandate. "[Q]uestions of the interpretation, application, and general adherence to or enforcement of the settlement" as they "may arise and affect the public interest will be dealt with by the courts in the most appropriate manner under the given circumstances." Id. at 474. The Court recognized, however, that any "further possible modification of the present accord" must be done "pursuant to the exercise of [this] Court's constitutional rule-making authority over the practice of law." Ibid. (emphasis added). Thus, while lower courts interpret and enforce the provision, only the Supreme Court may modify it.

For thirty-seven years, N.J. State Bar Ass'n jurisprudence has underscored this dichotomy as lower courts interpret and apply the mandate. See Century 21-Candid Realty v. Cliett, 203 N.J. Super. 78 (Law. Div. 1985) (cancellation of real estate sales contract in accordance with N.J. State Bar Ass'n prevented broker from receiving commission on cancelled sale); Kargen v. Kerr, 248 N.J. Super. 91 (Ch. Div. 1991) (interpreting the appropriate time

in which the three-day attorney-review period begins to run); <u>Wheatly v. Myung Sook Suh</u>, 207 N.J. Super. 539 (Law. Div. 1985), <u>rev'd in part on other grounds</u> 217 N.J. Super. 233 (App. Div. 1987) (applying <u>N.J. State Bar Ass'n</u> mandate to find that real estate brokers engaged in the unauthorized practice of law).

In carrying out its role as an intermediate appellate court, the Appellate Division has remained persistently wary of treading upon the Supreme Court's sole authority to alter the <u>N.J. State Bar Ass'n</u> mandate when occasionally pressed to do so. <u>See, e.g.</u>, <u>Conley v. Guerrero</u>, 443 N.J. Super. 62, 72 (App. Div. 2015), <u>aff'd as modified</u>, 228 N.J. 339 (2017) (refusing to alter the <u>N.J. State Bar Ass'n</u> mandate and "leav[ing] for others to address" whether to change methods of contract termination notice).

Our decision in <u>Calvert v. K. Hovnanian at Galloway IV, Inc.</u> illustrates our role in construing, as opposed to modifying, the <u>N.J. State Bar Ass'n</u> mandate. There, the real estate sale was "in-house," in that a licensed, on-site salesperson, employed directly by the condominium developer, prepared the contract. <u>Calvert</u>, 247 N.J. Super. 518, 524 (App. Div. 1991). Because <u>N.J. State Bar Ass'n</u> did not contemplate in-house transactions, the trial court held that the attorney review clause was inapplicable. <u>Id.</u> We reversed and explained that

State Bar Ass'n did not indicate that an exception to the attorney review clause requirement exists for "in-house" transactions. Rather…the Supreme Court specifically noted that every such contract must contain the attorney review clause. [citation omitted]. If an exception was intended, it would have been expressed. We frankly see no policy grounds for such an exception or for the distinction here advanced. Indeed, we view defendant's suggestion as counter to the salutary intentions of State Bar Ass'n. In any event, it is for the Supreme Court to modify State Bar Ass'n, if it sees fit. Thus, the trial judge erred in his conclusion that the "in-house" nature of this transaction rendered State Bar Ass'n inapplicable.

[Calvert, 247 N.J. Super. at 529–30, aff'd 128 N.J. 37 (1992) (emphasis added).]

The Supreme Court affirmed our decision in Calvert. 128 N.J. 37 (1992). Writing on behalf of a unanimous Court, Justice Garabaldi explained that the "directive in State Bar Ass'n was very specific: a licensed broker who prepares a real-estate contract must set out the precise language of the attorney-review clause." Id. at 46. However, the Supreme Court has also seen fit to modify the mandate when warranted. Thus in Calvert, the Court modified the N.J. State Bar Ass'n mandate in condominium sales contracts where the Planned Real Estate Development Full Disclosure Act, ("PREDFDA"), N.J.S.A. 45:22A-21 to -42 also applies. Calvert, 128 N.J. at 50. See also In re Opinion 26, 139 N.J. 323 (1995) (modifying the holding in N.J. State Bar Ass'n to sanction the "South Jersey" approach, in which residential real estate title closings are

conducted without attorneys representing either the seller or the buyer); Conley v. Guerrero, 228 N.J. 339 (2017) (modifying the N.J. State Bar Ass'n mandate to change contract cancellation notice methods); see also Conley, 228 N.J. at 357 (recognizing the Supreme Court "may need to modify the attorney-review clause again in the future").

These cases illustrate the Supreme Court's authority to modify the N.J. State Bar Ass'n mandate when changes are warranted. Just as N.J. State Bar Ass'n did not initially contemplate PREDFDA regulation, South Jersey practice, or notice via email, it similarly has made no exception for auction sales. Unless and until the Supreme Court modifies its requirements, judges and realtors are bound by N.J. State Bar Ass'n as written.

This constitutional limitation of our review allows for a straightforward analysis. Real estate sales contracts prepared by licensed realtors must include the attorney review provision. N.J. State Bar Ass'n, 93 N.J. at 474. Real estate auction contracts are not exempted by N.J. State Bar Ass'n. Because modifying the provision implicates the practice of law, only the Supreme Court may add or detract from it. Ibid. For N.J. State Bar Ass'n purposes, a realtor prepares a contract even when filling in the blanks of a pre-printed form. Calvert, 128 N.J. at 46.

Here, the sales contract did not contain the attorney review provision. The trial judge found that a licensed realtor filled in the blanks of the real estate contract. This brought the contract into the ambit of N.J. State Bar Ass'n. Failure to include the required language renders the contract void as a matter of public policy. The Constitution permits us to proceed no further in our analysis.

My colleagues in the majority have nevertheless adroitly highlighted the differences between a traditional real estate sale and a private auction. The majority concludes that the auction format the seller concocted here was intended to attract sophisticated investors like plaintiff. The realtor and the seller drafted the terms of the sales contract, none of which were negotiable, and made the contract available to the participating bidders for review in advance of the auction.[4]

---

[4] This type of nonnegotiable agreement is known as a contract of adhesion. The Supreme Court has recognized the inherent inequity of such contracts when they are used to transact business with the general public. Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 104 (1980). The Court thus developed a "distinct body of law surrounding contracts of adhesion . . . to determine whether and to what extent such nonconsensual terms will be enforced." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353-54 (1992). Indeed, the Court has applied these public policy concerns to invalidate a provision in a standardized real-estate-brokerage agreement that compelled the seller to pay a commission even if the buyer was financially unable or unwilling to complete the transaction. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553 (1967). The Court was particularly concerned about

I navigate these uncharted waters guided by the notion that at the time the Supreme Court approved the consent judgment in N.J. State Bar Ass'n, it was well aware that the real estate market included private auctions conducted by licensed realtors. It is also safe to presume that the sophisticated parties that litigated N.J. State Bar Ass'n were equally aware of private auctions. Thus, the policy arguments advanced by amicus New Jersey Realtors here could have been easily raised before Justice Sullivan to provide a rational basis to exempt private auctions in the consent judgment Justice Sullivan submitted to the Supreme Court for approval in 1983.

The majority's view is predicated on the countervailing presumption. My colleagues construe the Court's holding in N.J. State Bar Ass'n to affirmatively exclude auctions contracts from the three-day attorney review mandate by virtue of their omission from Justice Sullivan's Consent Judgment. I respectfully disagree. Any intended exceptions to the mandate would have been expressed by the Supreme Court at the time. Calvert, 247 N.J. Super. at 530. Indeed, the Court has not hesitated in making practical modifications to the N.J. State Bar Ass'n mandate. See Conley, 228 N.J. at 356 (modifying N.J. State Bar Ass'n to permit notice of contract disapproval via email).

---

(continued)
the "undue advantage" created by the "monopolistic or practical control in the business transaction . . . ." Ibid.

In my view, the majority's holding exercises jurisdictional authority over a subject matter exclusively reserved to our Supreme Court by our State's Constitution. In this opinion, the Appellate Division materially exceeds the boundary of its role to interpret, apply, generally adhere, and enforce the N.J. State Bar Ass'n mandate. 93 N.J. at 474. Because this court lacks the ability to modify the mandate, the policy implications discussed by the majority surpass the dispositive issue in this appeal.

In Bassford v. Trico Mortg. Co., Inc., we affirmed a trial court's decision not to require the attorney review provision under the limited material facts of the case. 273 N.J. Super. 379, 382 (Law Div. 1993), aff'd o.b., 273 N.J. Super. 228 (App. Div. 1994). The trial judge in Bassford held that "[a]rguably, no attorney review is allowed of [auction] bids, to protect the expediency and finality of the bidding process." Id. at 387. We explained that "[b]ecause the…representative who [filled in the blanks] of the contract was not a licensed real estate broker or sales[person]," "we need not decide whether licensed real estate brokers or sales[persons] acting as auctioneers are exempt from the provisions of [N.J. State Bar Ass'n]." Bassford, 273 N.J. Super. at 230. The circumstances in Bassford are materially distinguishable from the facts we confront here.

The Real Estate Commission's decision to codify N.J. State Bar Ass'n's holding in N.J.A.C. 11:5-6.2(g) further supports that this court adopt a policy of enhanced deference to the Supreme Court's exclusive constitutional role in this matter. Indeed, just three years ago, a unanimous Supreme Court in Conley explained that "Section 6.2(g) requires every contract for the sale of certain real estate" to contain the attorney-review language. Conley, 228 N.J. at 352 (emphasis added). It is undisputed that the property here fell within the "certain" real estate covered by the mandate, and there should likewise be no dispute that this was one of a multitude of "every" such contract. As the Real Estate Commission explained:

> By reciting the attorney review language mandated by the Supreme Court in this regulation, and directing its inclusion in all broker prepared contracts for the sale or lease of residential properties falling within the Supreme Court's order, all licensees will have easy access to the required language.
>
> [18 N.J.R. 1677(a) (Aug. 18, 1986) (emphasis added).]

The Real Estate Commission has not made any attempt to distinguish the Supreme Court's mandate in N.J. State Bar Ass'n to provide a regulatory exclusion for auction contracts. Indeed, in its decision to adopt N.J.A.C. 11:5-6.2(g) the Real Estate Commission reaffirmed that:

> Attorney review is a process mandated by a ruling of the New Jersey Supreme Court. The Commission cannot alter, amend or repeal the dictates of a

9

> Supreme Court decision by the adoption of an administrative rule, or by any other action.
>
> [19 N.J.R. 1646(a) (Sept. 8, 1987).]

Furthermore, in summarizing the more than fifty comments received during the notice-and-comment period, the Commission did not identify any comment that advocated for an auction exception or referred to auction-derived contracts. Id. Thus, neither the text nor the regulatory history of N.J.A.C. 11:5-6.2(g) support exempting private auction sales. Although the arguments advanced by Sullivan, Max Spann, and amicus New Jersey Realtors advocating for the exclusion of auction sales from attorney-review requirements may warrant serious consideration by the Supreme Court, our institutional role as an intermediate appellate court precludes us from rushing ahead of the Court in an area of law constitutionally reserved for its jurisdiction.

In April 2008, my friend and mentor Judge Edwin Stern was selected to address a representative group of our State's legal community and deliver the Chief Justice Joseph Weintraub Lecture Series.[5] Judge Stern named his address: "Frustrations of an Intermediate Appellate Judge (And The Benefits

---

[5] This prestigious lecture series was established by the Rutgers-Newark Law School Alumni Association in honor of the late Chief Justice of the New Jersey Supreme Court. The series was inaugurated in 1982 by the late Chief Justice Robert N. Wilentz.

Of Being One In New Jersey)." In a section of his scholarly presentation entitled "Departures from Precedent," Judge Stern noted that "there is nothing inappropriate about suggesting that the New Jersey Supreme Court reconsider a precedent so long as the intermediate appellate court respects it and does not overstep its bounds or authority." Hon. Edwin H. Stern, <u>Frustrations of an Intermediate Appellate Judge (And the Benefits of Being One in New Jersey)</u>, Chief Justice Joseph Weintraub Lecture (April 16, 2008), <u>in</u> 60 <u>Rutgers L. Rev.</u> 971, 978 (2008).

Based on all the reasons discussed here and mindful of Judge Stern's wise admonition, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION